# 16-2750 (L)

(consolidated with 16-2752)

In the United States Court of Appeals for the Second Circuit

SPENCER MEYER, Individually and on behalf of
those similarly situated,
*Plaintiff-Counter-Defendant-Appellee*,

v.

UBER TECHNOLOGIES, INC.
*Defendant-Counter-Claimant-Appellant.*
ERGO,
*Third-Party-Defendant*
TRAVIS KALANICK,
*Defendant-Appellant.*

On Appeal from the United States District Court for the Southern District of New
York, No. 15-cv-09795, Honorable Jed. S. Rakoff Presiding

## BRIEF OF *AMICUS CURIAE* PUBLIC JUSTICE, P.C.
## IN SUPPORT OF PLAINTIFF-COUNTER-
## DEFENDANT-APPELLEE

Jonathan D. Selbin
Jason L. Lichtman
Lieff Cabraser
 Heimann & Bernstein, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
(212) 355-9500

Jahan Sagafi
Outten & Golden LLP
One Embarcadero Center, 38th Floor
San Francisco, CA 94111
(415) 638-8800

*Counsel for* Amicus Curiae *Public Justice, P.C.*
(additional counsel on inside cover)

1332243.1

Paul W. Mollica
Outten & Golden LLP
161 Clark Street, Suite 1600
Chicago, IL 60601
(312) 809-7010

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Public Justice, P.C. has no parent corporation, and no publicly held corporation owns any of its stock.

# **TABLE OF CONTENTS**

**Pages**

CORPORATE DISCLOSURE STATEMENT ..........................................................i

STATEMENT OF INTEREST OF *AMICUS CURIAE*...........................................1

INTRODUCTION ...................................................................................................2

SUMMARY OF THE ARGUMENT .....................................................................5

ARGUMENT ..........................................................................................................6

I.     THE DISTRICT COURT'S DECISION SETS FORTH AN
IMPORTANT AND WELL-SUPPORTED LEGAL FRAMEWORK
FOR EXAMINING CONTRACT FORMATION IN INTERNET
AND MOBILE AGREEMENTS. ..................................................................6

     A.     This court should reaffirm that online and mobile contracts
require unambiguous assent. ...............................................................8

     B.     This court should strictly apply the conspicuous notice
standard. ............................................................................................11

     C.     This case exemplifies the need for rigorous application of the
notice and assent standard. ...............................................................16

II.    UBER KNOWS HOW TO PROVIDE MORE CONSPICUOUS
NOTICE WHEN IT CHOOSES TO DO SO. ..............................................18

III.   MOBILE CONTRACTING DEMANDS A HIGHER STANDARD
OF NOTICE, NOT A LOWER ONE..........................................................23

CONCLUSION .....................................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

<u>**Pages**</u>

### CASES

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ......................................................................................2, 3

*Bar-Ayal v. Time Warner Cable Inc.*,
No. 03 CV 9905(KMW), 2006 WL 2990032 (S.D.N.Y. Oct. 16, 2006).............10

*Bekele v. Lyft, Inc.*,
No. 15-11650-FDS, 2016 WL 4203412 (D. Mass. Aug. 9, 2016)......................10

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015)...................................................... 12, 14, 16

*Feldman v. Google, Inc.*,
513 F. Supp. 2d 229 (E.D. Pa. 2007)...................................................................12

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) ..............................................................................................2

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
561 U.S. 287 (2010) ..............................................................................................2

*Knutson v. Sirius XM Radio Inc.*,
771 F.3d 559 (9th Cir. 2014)................................................................................7

*Long v. Provide Commerce, Inc.*,
200 Cal. Rptr. 3d 117 (Cal. Ct. App. 2015) ................................................ passim

*Mohamed v. Uber Techs., Inc.*,
109 F. Supp. 3d 1185 (N.D. Cal. 2015), *reversed in part*
*on other grounds*, 836 F.3d 1102 (9th Cir. 2016) ............................... 8, 18, 19, 20

*Nat'l Fed'n of the Blind v. Container Store, Inc.*, No. 15-CV-12984 (NMG), 2016
WL 4027711 (D. Mass. July 27, 2016), appeal filed (1st Cir. No. 16-2112) ........9

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014).........................................................................4, 7

# TABLE OF AUTHORITIES
(continued)

**Pages**

*O'Connor v. Uber Techs., Inc.*,
  No. 13-3826, 2015 WL 5138097 (N.D. Cal. Sept. 1, 2015) ...............................21

*ProCD, Inc. v. Zeidenberg*,
  86 F.3d 1447 (7th Cir. 1996) ...............................................................................12

*Register.com v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ........................................................................ 2, 23

*Schnabel v. Trilegiant Corp.*,
  697 F.3d 110 (2d Cir. 2012) ................................................................................17

*Sgouros v. TransUnion Corp.*,
  817 F.3d 1029 (7th Cir. 2016) ..............................................................................4

*Specht v. Netscape Commc'ns Corp.*,
  306 F.3d 17 (2d Cir. 2002) ........................................................................ passim

## RULES

Fed. R. App. P. 29(c)(5) ..............................................................................................1

Local Rule 29.1(b) .......................................................................................................1

## OTHER AUTHORITIES

Bakos et al., *Does Anyone Read the Fine Print? Consumer Attention to Standard
  Form Contracts*, 43 J. of Legal Studies 1 (2014) .................................................25

Becher & Unger-Aviram, *The Law of Standard Form Contracts: Misguided
  Intuitions and Suggestions for Reconstruction*, 8 DePaul Bus. & Com. L.J. 199
  (2009) ....................................................................................................................25

Gindin, *Nobody Reads Your Privacy Policy or Online Contract? Lessons Learned
  and Questions Raised by the FTC's Action Against Sears*, 8 Nw. J. of Tech. &
  Intell. Prop. 1 (2009) ...........................................................................................27

# TABLE OF AUTHORITIES
### (continued)

**Pages**

*In re Sears Holding Mgmt. Corp.*, No. C-4263 (F.T.C. June 4, 2009), goo.gl/ESw2Mc ........................................................................................26

Kedmey, *This is How Uber's 'Surge Pricing' Works*, Time, Dec. 15, 2014 ..........21

Kosoff, *Stop complaining about Uber's surge pricing*, Business Insider, Nov. 1, 2015, http://www.businessinsider.com/uber-surge-pricing-on-new-years-eve-2015-10................................................................................................................22

Lowrey, *Is Uber's Surge-Pricing an Example of High-Tech Gouging?*, N.Y. Times Mag., Jan. 10, 2014 ............................................................................................21

Maronick, *Do Consumers Read Terms of Service When Installing Software? A Two-Study Empirical Analysis*, 4 Int'l J. of Bus. & Soc. Res. 137 (2014) ..........25

Marotta-Wurgler, *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's 'Principles of the Law of Software Contracts'*, 78 Univ. of Chi. L. Rev. 165 (2011) ........................................................................26

Uber, *Uber Help: Accepting surge pricing*, https://help.uber.com/h/707e5567-a8ea-47c0-9e2b-bd2fbc2aa763 (last accessed Nov. 29, 2016) ...........................21

Uber, *Uber Newsroom: Clear and Straight-forward Surge Pricing*, https://newsroom.uber.com/clear-and-straight-forward-surge-pricing (last accessed November 30, 2016)..............................................................................21

Vail et al., *An Empirical Study of Consumer Perceptions and Comprehension of Web Site Privacy Policies*, 55 IEEE Transactions on Eng'g Mgmt. 442 (2008).26

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

Public Justice, P.C. is a national public interest law firm that specializes in precedent-setting, socially significant civil litigation, with a focus on fighting corporate and governmental misconduct. To further its goal of defending access to justice for workers, consumers, and others harmed by corporate wrongdoing, Public Justice has long conducted a special project devoted to fighting abuses of mandatory arbitration. As part of this project, Public Justice has fought to protect the fundamental principle underlying both contract law and arbitration law: that parties may not be forced to abide by a contract—arbitration or otherwise—to which they have not agreed.

In this case, Uber seeks to impose on consumers terms of which they had no notice and to which they did not unambiguously assent. This is not only contrary to longstanding law, but also fundamentally unfair. Companies should not be permitted to force consumers to abide by terms to which they did not agree, simply because those terms are online.

Public Justice frequently represents consumers challenging unfair arbitration contracts. It, therefore, has a strong interest in ensuring that the law is as clear

---

[1] Pursuant to Rule 29(c)(5) of the Federal Rules of Appellate Procedure and Local Rule 29.1(b), *amicus* affirms that no counsel for any party authored this brief in whole or in part, no party or party's counsel contributed money intended to fund preparing or submitting the brief, and no person, other than *amicus*, their members, and counsel, contributed money that was intended to fund preparing to submitting this brief. All parties consented to the filing of this brief.

online as it is off: Consumers who never agreed to arbitrate cannot be forced to do so.

## **INTRODUCTION**

It goes without saying that the internet has changed just about everything about the way we do business in our society—and that is particularly true for consumers purchasing goods and services on mobile devices. Yet, as this Court has held, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004).

That holding is no less applicable—or true—where those principles of contract arise in the context of an arbitration clause. Indeed, while the Supreme Court has made clear that courts cannot single out arbitration clauses in consumer contracts for special disfavor simply because they involve arbitration, *see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), it has also made clear that "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) ("[A] court may order arbitration of a particular dispute only where the

court is satisfied that the parties *agreed* to arbitrate that dispute.") (emphases altered).

Indeed, in providing the fifth vote for the majority in the Supreme Court's seminal decision in *Concepcion*, Justice Thomas reiterated the continued importance and vitality of state common law defenses to contract formation, writing: "the FAA requires that an agreement to arbitrate be enforced unless a party successfully challenges the formation of the arbitration agreement, such as by proving fraud or duress," that is, shows that there are "defects in the making of an agreement." 563 U.S. at 353 (Thomas, J., concurring).

It is one thing to accept, as in *Concepcion*, the legal fiction that consumers knowingly and expressly waive their constitutional right to a jury trial by ordering goods or services subject to contracts with arbitration clauses, all because of a 1925 statute that sought to protect arbitration between sophisticated commercial parties from a now long-extinct judicial hostility to arbitration. It is quite another thing to add yet another layer of legal fiction by pretending consumers have agreed to contractual terms that do not meet even the most basic contractual principles of offer and assent, principles that apply with no less force simply because they relate to arbitration. The Federal Arbitration Act ("FAA"), for all the deference to arbitration it requires, does not displace the basic rules of contract formation. Even

where an arbitration clause is at issue, courts must still determine whether a contract exists in the first place.

It is easy for companies to create an enforceable contract over the internet—indeed, Uber itself has repeatedly done so in other contexts. Nevertheless, companies sometimes attempt to enforce contracts that do not satisfy the basic rules of contract formation. *See, e.g.*, *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 22-23 (2d Cir. 2002) (Sotomayor, J.) (affirming district court finding of no consent where terms were located only down the page below the download button); *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033-36 (7th Cir. 2016) (same, where the defendant's website actively misled the consumer); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014) (same, where user was not required to affirmatively acknowledge the terms of use).

When asked to enforce a contract, therefore, courts must do the hard work of determining whether the contract was actually validly formed to begin with. Here, the district court did the hard work and fact-finding, and determined—correctly—that Meyer did not consent to the terms of Uber's user agreement, including the arbitration clause and class waiver. That decision should be affirmed. And this Court should make clear that companies cannot escape the basic requirements of contract formation, simply because their contracts are online.

## SUMMARY OF THE ARGUMENT

In a comprehensive opinion, Judge Rakoff applied longstanding contract principles to mobile technology. The law is clear. To form a contract online, companies must provide conspicuous notice of the contract and a mechanism for the consumer to unambiguously manifest assent. This standard should be rigorously enforced. Otherwise, companies like Uber will continue to try to bind consumers to contracts to which they never agreed—and courts will continue to be mired in cases trying to determine whether a reasonable consumer would have seen a tiny link at the bottom of a site or known that clicking a particular button meant assenting to a contract they'd never read. Online companies have the burden of offering contracts in a way that consumers can understand—and unambiguously accept (or reject). This Court should hold them to their burden. This turns out not to be a particularly hard case: the barely discernable notice and lack of unambiguous assent are glaring problems.

Providing effective and conspicuous notice is not difficult and does not pose the threat to mobile commerce that Uber's *amici* portend. One need only look at the kinds of notice Uber itself provides to users in other contexts. In the past, when Uber has required its drivers to agree to arbitration, it has done so using far more prominent notice and unambiguous assent than here. And when Uber has

required passengers to pay so-called premium "surge prices," it likewise ensures that they know exactly what they agree to pay before initiating the transaction.

Uber's *amici* urge that a lower standard of notice should apply in the world of mobile contracting. That is wrong as a matter of law and logic because it places the burden on consumers to adjust their behavior and choices to the types of notice retailers choose to provide, rather than obligating the retailer to provide effective notice regardless of how a consumer accesses the retailer's services. It also does not square with market realities, because available research indicates that mobile consumers need *more stringent* forms of notice on mobile technology, not less.

## **ARGUMENT**

### I.     **THE DISTRICT COURT'S DECISION SETS FORTH AN IMPORTANT AND WELL-SUPPORTED LEGAL FRAMEWORK FOR EXAMINING CONTRACT FORMATION IN INTERNET AND MOBILE AGREEMENTS.**

Nearly fifteen years ago, this Court—interpreting California law (which also applies here)—set forth two criteria for consumers to assent to online contracts: "conspicuous notice of the existence of contract terms *and* unambiguous manifestation of assent to those terms by consumers." *Specht*, 306 F.3d at 35 (emphasis added). Both criteria are "essential if electronic bargaining is to have integrity and credibility." *Id*.

The two-part standard adopted by this Court in *Specht* for assent to online terms of service is grounded in core principles of contract law, and balances

protection of consumers in the dynamic web-based environment with web retailers' ability to experiment with the design of their web portals. The Ninth Circuit and California courts cite *Specht* favorably. *See, e.g.*, *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 569 (9th Cir. 2014); *Nguyen*, 763 F.3d at 1173 (citing same standard); *Long v. Provide Commerce, Inc.*, 200 Cal. Rptr. 3d 117, 125 (Cal. Ct. App. 2015); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016) (citing *Specht* under Washington contract law).

In the decision below, Judge Rakoff correctly applied *Specht* to the new world of mobile technology, recognizing that the need for "'integrity and credibility' of electronic bargaining" is as great today as ever. AA487 (quoting *Specht*, 306 F.3d at 35). As seen below, retailers often meet this standard by adopting what have come to be known as "clickwrap" contracts—interfaces that require a customer to expressly click a button that states that they agree to the terms of service before proceeding. While it possible that such assent could be unambiguously manifested by customers through *other* technological means, Judge Rakoff held that the *particular* method deployed by Uber—a method never before approved by this Court—fell short of doing so.

The only way to avoid Judge Rakoff's conclusion would be to water down the *Specht* notice-and-assent standard for apps. This would disturb the careful balance that this Court struck in *Specht*. Online customers, already operating at a

bargaining disadvantage, could be pushed unknowingly by online retailers into contracts that they never contemplated. Mobile apps, however convenient, must not be allowed to run roughshod over the well-settled contractual requirement of assent. This Court should reaffirm that the legal standard applied below for examining notice and assent in internet contracts—the same standard this Court adopted in *Specht*—continues to apply with equal force this Circuit.

### A. <u>This court should reaffirm that online and mobile contracts require unambiguous assent.</u>

Offline, contract formation is commonly achieved by a written contract (notice), which is accepted by signing (unambiguous assent). Many companies have replicated this formulation online by preventing customers from accessing goods and services until they have been shown the company's terms of service (notice) and clicked a button stating that they agree to those terms (unambiguous assent).

These so-called "clickwrap" contracts have generally been approved by courts. *See, e.g.*, *Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d 1185, 1190-91 (N.D. Cal. 2015), *reversed in part on other grounds*, 836 F.3d 1102 (9th Cir. 2016) (interface in which drivers could not access app without clicking a button marked "Yes, I agree" beneath the phrase "By clicking below, you acknowledge that you agree to all the contracts above," with the contracts hyperlinked, and then clicking "Yes, I agree" on a screen containing text stating "Please confirm that you have

reviewed all the documents and agree to all the new contracts."); *Nat'l Fed'n of the Blind v. Container Store, Inc.*, No. 15-CV-12984 (NMG), 2016 WL 4027711, at *10 (D. Mass. July 27, 2016), appeal filed (1st Cir. No. 16-2112) ("[T]o enroll online, Plaintiff Lineback must have checked a box that reads 'I agree to the POP! terms and conditions'").

Uber's contract here is not a clickwrap contract. Riders are not required to click a button or check a box, the sole purpose of which is to indicate assent to Uber's terms of service. Instead, Uber contends that riders agree to its terms simply by clicking the "Register" button. The problem, of course, is that clicking "Register" is the action riders must take to indicate they wish to register for the Uber mobile app, regardless of whether they also intend to agree to Uber's terms of service—indeed, regardless of whether they even know Uber has terms of service. Clicking "Register," then, is, at best, ambiguous: It is impossible to tell whether a consumer who has clicked "Register" has seen and intends to accept Uber's terms or whether the rider has no idea such terms even exist and merely wishes to register an Uber account. The action for both is exactly the same. This Court has never held that such an ambiguous action can constitute unambiguous assent. Nor have California courts.

Requiring consumers to click a separate box or press a separate button that unambiguously states that the consumer assents to contractual terms is easy.

9

Companies do it all the time.  *See, e.g.*, *Bar-Ayal v. Time Warner Cable Inc.*, No. 03 CV 9905(KMW), 2006 WL 2990032, at *9-10 (S.D.N.Y. Oct. 16, 2006) (requiring users to click "Accept" to confirm that they "had the opportunity to read and understand each and every term set forth [in the agreements]."); *Bekele v. Lyft, Inc.*, No. 15-11650-FDS, 2016 WL 4203412, at *8 (D. Mass. Aug. 9, 2016) (finding assent where user "clicked the prominent 'I accept' button at the bottom of the" terms of service).

Indeed, as explained below, Uber itself does exactly that in other contexts. There is, therefore, no technological reason for a company ever to rely on ambiguous actions to demonstrate assent.

Given the ease of providing for unambiguous assent, it's hard to escape the conclusion that the only reason companies like Uber might attempt to garner assent to contractual terms through actions a consumer would do anyway—such as registering for an account or browsing a website—is to gain "consent" to terms to which a consumer does not actually *intend* to agree, terms a consumer may not even know exist.  This assent-by-subterfuge approach to online contracting makes it difficult for courts to determine whether a consumer has truly seen and assented to contractual terms.  And it increases the risk that consumers will be forced to abide by terms to which they never agreed.

This Court should make clear that companies cannot evade the requirement of unambiguous assent simply by placing an inconspicuous reference to terms of service somewhere on their website (or mobile app). As this Court held in *Specht*, "[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Specht*, 306 F.3d at 29. But mutual assent cannot be determined (lot alone unambiguously) if consumers are not offered an express option to back out of the transaction, because they do not assent to the contract's terms.

This Court, therefore, should reaffirm its holding in *Specht* that at a minimum, companies are required to provide "*conspicuous*" notice that a contract is being offered and that a particular action will constitute acceptance of that contract. *See Specht*, 306 F.3d at 32 (emphasis added). Conspicuous notice is essential to ensuring that a consumer that performs an action that ostensibly indicates assent to contractual terms actually intends to manifest assent to those terms. That is, it is essential to ensuring the fundamental integrity of contract law.

**B.**     **This court should strictly apply the conspicuous notice standard.**

Providing conspicuous notice online is not difficult. For example, in *Feldman v. Google*, the court held an online contract was validly formed, where the text of the agreement was "immediately visible to the user" upon visiting the webpage, "as was a prominent admonition in boldface to read the terms and

conditions carefully," and an "instruction to indicate assent if the user agreed to the terms." 513 F. Supp. 2d 229, 237 (E.D. Pa. 2007). And in *ProCD, Inc. v. Zeidenberg*, the Seventh Circuit held that a software user had accepted the software company's licensing agreement, where the "software splashed the license on the screen" every time it was used and "would not let [the user] proceed without indicating acceptance." 86 F.3d 1447, 1452 (7th Cir. 1996).

Although the methods of providing conspicuous notice vary, the underlying principle is the same: Notice is conspicuous if it is "immediately visible"—that is, if a reasonable consumer could not miss it, *Feldman*, 513 F. Supp. 2d at 237; *see also, e.g.*, *ProCD*, 86 F.3d at 1452. Where notice is not "immediately visible"— where the design of a website or mobile app obscures the fact that certain conduct will be deemed acceptance of contractual terms—courts have refused to enforce those terms. *See*, *e.g.*, *Specht*, 306 F.3d at 31; *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 402 (E.D.N.Y. 2015); *Long*, 200 Cal. Rptr. 3d 117.

In *Specht*, for example, Netscape argued that by downloading free software from its website, users were bound by contractual terms, which stated that installing the software constituted consent to those terms. *See Specht*, 306 F.3d at 24, 30. This Court disagreed. *Id.* at 31. The problem, the Court explained, was that while the button to download the software was "immediately visible," the "sole reference" to the contractual terms was not. *Id.* at 23, 31. To the contrary,

the terms would only become visible if users scrolled down below the Download button—an action that was totally unnecessary to download the software. *Id.* at 31. Netscape's webpage, therefore, was "printed in such a manner that it tended to conceal," rather than make conspicuous, "the fact that [downloading the software] was an express acceptance of Netscape's rules and regulations." *Id.* at 32 (internal quotation marks and brackets omitted). Downloading the software, therefore could not constitute an unambiguous manifestation of assent to those rules. *Id.*

Netscape literally placed its terms of service out of sight. Some companies, however, like Uber in this case, have tried more subtle ways of binding consumers to terms without drawing the consumer's attention to those terms. These subtle attempts are no less harmful than the blatant ones: If allowed to stand, consumers are still bound to terms they never agreed to. Courts, therefore, have rightfully rejected them.

In *Long*, for example, the California Court of Appeal refused to enforce a company's terms of use, despite the fact that a link to the terms was technically visible on the website's check-out page. *Long*, 200 Cal. Rptr. 3d 117. Although the link was present on the page, the court held that it was not sufficiently conspicuous. *Id.* at 126. While the company contended that the link was "next to the fields and buttons a consumer must interact with to complete his order," in fact, to find the link, a consumer would need to look "below the buttons he must click to

proceed with the order," "even further below a 'VeriSign Secured' logo and notification," and "still further below a thick dark green bar with a hyperlink for "SITE FEEDBACK." *Id.* Though "no scrolling [was] required" to find the link, given the link's "placement, color, size and other qualities relative to the . . . website's overall design," the court held, the "practical reality" was that, just as in *Specht*, the site "tended to conceal" rather than reveal "the fact that placing an order was an express acceptance of [the] rules and regulations." *Id.* (internal quotation marks and brackets omitted).  It, therefore, did not provide sufficiently conspicuous notice.  *Id.*

And in *Berkson*, the court held that even a hyperlink that was directly above the sign-in button—and stated that clicking the button would constitute acceptance of the terms—was insufficient to constitute conspicuous notice.  97 F. Supp. 3d at 402.  Though the company had linked to the terms of service, the "design and content of the website" ensured that the link was not "readily and obviously" available.  *Id.* at 404.  While the sign-in button was "very user-friendly and obvious, appearing in all caps, in a clearly delineated box in both the upper right hand and the lower left hand corners of the homepage," the notice of the existence of terms of service was in small font, and was neither in "all caps" nor "bold."  *Id.* Thus, the company's small-print notice of terms was "obscured by the physical manifestation of assent, in this case clicking the 'SIGN IN' button."  *Id.*  It was not

enough, the court made clear, to simply provide the right words. A website must ensure that those words are "conspicuous"—that the user's attention is drawn towards and not away from the notice the company is required to provide.

These cases make good sense. The "conspicuous notice" and unambiguous manifestation of assent standard should be stringently applied. Requiring companies to provide truly conspicuous notice and a mechanism for truly unambiguous consent will ensure that consumers are not bound to contracts they never agreed to; that courts are not mired in endless factfinding to determine whether an ambiguous action should be deemed to manifest assent; and that companies have no incentive to push the envelope to see how inconspicuous they can make their terms and still have them enforced.

As demonstrated above, providing conspicuous notice and unambiguous assent is not difficult. It is just as easy to design a website (or mobile app) where the existence of terms of service—and the action taken to accept those terms—is "immediately visible" as it is to obscure the terms by other features. There is now plenty of case law providing examples of online notice and assent mechanisms that courts will accept as valid as a matter of law. There is no reason that companies like Uber cannot adopt one of these mechanisms. Indeed, in other contexts, it already has.

**C.** **This case exemplifies the need for rigorous application of the notice and assent standard.**

The lower court correctly held that Uber's registration page did not provide conspicuous notice of the existence of the company's terms of service, nor did clicking the "Register" button provide an unambiguous manifestation of assent to those terms. Much like the contract in *Long*, the California Court of Appeal case, the link to Uber's terms was not directly next to the payment fields a user needed to fill in or the Register button a user needed to press. Instead, to find any notice of the terms of service, the user would need "to remove his attention from the fields in which he is asked to enter his [payment] information," "look below the [register button] he must click to proceed with" registering for an Uber account, and look even further below two large buttons labeled "Paypal and Google." *Long*, 200 Cal. Rptr. 3d at 866. Only then would the user come to a link to the terms of service—a link in tiny font, "'obscured . . . by the physical manifestation of assent expected'" of the user (the Register button). AA486 (quoting *Berkson*, 97 F. Supp. 3d at 402).

Moreover, even then, Uber's terms could only be located if the customer happened to click through *two* screens. Appellants' Br. at 8-9. As Judge Rakoff summarized, by clicking the hyperlink, "the user is taken to a screen that contains a button that accesses the 'Terms and Conditions' and 'Privacy Policy' then in effect.' . . . . Thus, it is only be clicking first the hyperlink and then the button—

neither of which is remotely required to register with Uber and begin accessing its services—that a user can even access the Terms and Conditions." AA472. Even after clicking two screens, though, the customer's search is still not over: the arbitration clause and class waiver were buried on the bottom of the seventh of nine pages of "highly legalistic language." *Id.*

This is not the "immediately visible" notice this Court requires. To the contrary, as the lower court explained, "it is hard to escape the inference that the creators of Uber's registration screen hoped that the eye would be drawn seamlessly to the credit card information and register buttons instead of being distracted by the formalities in the language below." AA485. "Uber's registration screen 'made joining [Uber] fast and simple and made it appear—falsely—that being a [user] imposed virtually no burdens on the consumer besides payment.'" AA486 (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 127–28 (2d Cir. 2012).

It is impossible to tell from Uber's registration screen whether a user would actually have noticed—or intended to assent to—Uber's terms of service. Yet, as explained below, Uber knows very well how to provide conspicuous notice of its terms of service and how to capture the unambiguous manifestation of assent. It simply chose not to do so here. Because of that choice, the plaintiff risks being bound to terms he never agreed to. And the lower court—and now this Court—are

required to spend time examining Uber's interface and hypothesizing what a reasonable consumer might think of it, all the while delaying the adjudication of the plaintiff's substantive claims.

The costs of companies' decision not to clearly communicate their contracts—and provide consumers an unambiguous method of consent—should not fall on the consumer or the courts. Given that companies are easily able to create online and mobile interfaces that leave no doubt that a consumer unambiguously assented, they should be required to do so.

## II. UBER KNOWS HOW TO PROVIDE MORE CONSPICUOUS NOTICE WHEN IT CHOOSES TO DO SO.

Requiring effective notice does not, as Uber *amici* Internet Association and Consumer Technology Association ("IACTA") say, "threaten the efficient and now-customary experience between consumers and companies on mobile devices and the resulting benefits that flow to all parties." IACTA Br. at 3. Mobile businesses can operate perfectly well without duping consumers into waiving away their rights. One need not speculate whether it is unduly burdensome for such businesses to provide effective, conspicuous notice through a smartphone application: Uber's own actions readily establish that it is not.

In *Mohamed*, drivers alleged that Uber violated the Fair Credit Reporting Act and similar state laws through its use of background checks in hiring and firing decisions. 109 F. Supp. 3d 1185. The district court found that the plaintiffs

consented to the terms of the contracts between Uber and its drivers, including arbitration clauses. *Id.* at 1189-90. The drivers in *Mohamed*, like Meyer here, used smartphones to access the Uber application. *Id.* at 1190-91. And, like here, the process of accessing the application included reference to terms of service providing for arbitration of the disputes at issue. *Id.* at 1193. That is where the similarities end.

In order to access the Uber application, drivers were required to pass through two screens. *Id.* at 1190. The top of the first screen stated in all-caps, "TO GO ONLINE, YOU MUST AGREE TO ALL THE CONTRACTS BELOW." *Id.* Below that, the screen provided direct hyperlinks to the contracts in bold type. *Id.* Below that, the screen provided "By clicking below, you acknowledge that you agree to all of the contracts above." *Id.* Only beneath all of that was a button with large texting stating "Yes, I Agree," which, if clicked, sent the drivers to the second screen. *Id.* The second screen consisted only of a box stating (in bold and caps) "**PLEASE CONFIRM THAT YOU HAVE REVIEWED ALL OF THE DOCUMENTS AND AGREE TO ALL THE NEW CONTRACTS**," followed by "YES I AGREE" and "NO" buttons. *Id.* at 1191. The following images were reproduced in the district court's opinion:

1332243.1

19



Uber's choice of notice mechanism to its drivers in *Mohamed* stands in stark contrast to its choice here with respect to consumers. Unlike the drivers in *Mohamed*, who were required to *twice* indicate their assent to the agreements, Meyer never clicked a button indicating he so agreed. Whereas the notice in *Mohamed* appeared in prominent size and font in the middle of the first screen, the binding language at issue here was in small font, buried at the bottom of the screen. And while the driver-sign-up in *Mohamed* featured two screens dedicated solely to providing notice of the contracts and securing assent, here the notice was subtly incorporated into a screen predominately aimed at securing payment.

Uber has also demonstrated its ability and willingness to provide effective and conspicuous notice in other contexts involving passengers like Meyer. At times, Uber has employed "surge pricing," a multiplier on the typical fare to reflect increased passenger demand and/or decreased driver supply. *See O'Connor v.*

*Uber Techs., Inc.*, No. 13-3826, 2015 WL 5138097, at *17 (N.D. Cal. Sept. 1, 2015); Lowrey, *Is Uber's Surge-Pricing an Example of High-Tech Gouging?*, N.Y. Times Mag., Jan. 10, 2014; Kedmey, *This is How Uber's 'Surge Pricing' Works*, Time, Dec. 15, 2014.

When Uber employs surge pricing, it "work[s] on making sure sur[g]e pricing is clear and understandable to riders."  Uber, *Uber Help: Accepting surge pricing*, https://help.uber.com/h/707e5567-a8ea-47c0-9e2b-bd2fbc2aa763 (last accessed Dec. 5, 2016); *see also id.* ("[Y]our app screen will let you know if surge pricing is in effect."); Uber, *Uber Newsroom: Clear and Straight-forward Surge Pricing*, https://newsroom.uber.com/clear-and-straight-forward-surge-pricing (last accessed Dec. 5, 2016).  That commitment to effective notice results in a screen like this:



Kosoff, *Stop complaining about Uber's surge pricing*, Business Insider, Nov. 1, 2015, http://www.businessinsider.com/uber-surge-pricing-on-new-years-eve-2015-10.

Uber's surge pricing notice is effective in every way that the notice at issue in this case is not. The customer must assent to the surge pricing before she "can even hail the car." *Id.* ("Uber will never spring surge pricing on you without consciously acknowledging what you're paying for."). The application provides the notice in "big bold print so [the customer] can't miss it." *Id.* Indeed, sometimes, when surge-pricing rates are particularly high, Uber has required customers to type in the multiplier manually to affirm that they consent to its use, *i.e.*, "to make sure they know what to expect." *Id.*

It is apparent that Uber views surge-pricing as a critical term of its contracts with passengers, and works to ensure those passengers have effective notice of the price multiplier. It is equally apparent that Uber views the terms of service at issue in this case, including the arbitration clause, as insignificant, and so permits customers like Meyer to use the service without assenting to the terms, and puts little effort into making the terms a prominent part of the sign-in process. *See* AA477 (finding that "the notification was in a font that was barely legible on the smartphone device that a would-be Uber registrant could be expected to use").

What constitutes reasonably conspicuous notice does not turn on whether Uber considers the contract provisions at issue important to customers, nor on whether the contractual term involves arbitration (as here) or more generic terms (as in surge pricing). Uber's use of prominent and effective notice of surge pricing shows that Uber itself thinks that giving notice to "a reasonably prudent offeree," *Specht*, 306 F.3d at 35, requires more than small text buried at the bottom of a screen with no button prompting the customer to assent to the terms.

## III. MOBILE CONTRACTING DEMANDS A HIGHER STANDARD OF NOTICE, NOT A LOWER ONE.

The mobile Internet has in many ways changed everything about the modern consumer experience. But as this Court has stated, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com*, 356 F.3d at 403. Yet Uber's

*amici* argue that the brave new world of mobile contracting requires a lower standard of fair notice. *See, e.g.*, Chamber of Commerce Br. at 14 (suggesting that the standard must reflect "the group of consumers who are knowledgeable enough about the Internet and mobile devices to sign up for and use Uber's services through its mobile application); IACTA Br. at 3-4 ("[T]he district court should have analyzed the conspicuousness of contract terms for a mobile contract from the perspective of a consumer that actually engages in mobile contracting.").

This position improperly shifts the burden from Uber to its customers. The law requires Uber to provide effective notice regardless of how users interact with Uber's services. *See Long*, 200 Cal. Rptr. 3d at 127 ("[T]he onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.") (citation omitted). *Amici*'s argument would require consumers to conform their behavior to the level of notice that Uber unilaterally imposes. For example, IACTA blames the "screen size" of Meyer's phone for the district court's conclusion that Meyer was not on inquiry notice, and states that "a consumer has the choice to select a screen that best fits his or her needs." IATCA Br. at 12. A user's decision to opt for a smaller smartphone does not relieve Uber of *its* burden to provide reasonable notice.

*Amici's* position also does not square with the facts. Available research shows that, if anything, the standard of notice for "a reasonable consumer who

engages in mobile-contracting," IACTA Br. at 9 (emphasis removed), is higher, not lower.

The length and complexity of a contract is a significant factor in why consumers decide not to read form contracts. *See* Maronick, *Do Consumers Read Terms of Service When Installing Software? A Two-Study Empirical Analysis*, 4 Int'l J. of Bus. & Soc. Res. 137, 144 (2014); Becher & Unger-Aviram, *The Law of Standard Form Contracts: Misguided Intuitions and Suggestions for Reconstruction*, 8 DePaul Bus. & Com. L.J. 199, 220-21 (2009). In the world of online and mobile contracting, businesses do not save any costs by shortening or simplifying contracts. As a result, long, difficult-to-read contracts are common, just like the "nine pages of highly legalistic language that no ordinary consumer could be expected to understand" in this case. AA472. Mobile customers, accustomed to page after page of legalese, may be especially averse to reviewing terms and conditions. *See* Bakos et al., *Does Anyone Read the Fine Print? Consumer Attention to Standard Form Contracts*, 43 J. of Legal Studies 1 (2014) (finding that only one or two of every thousand internet retail software shoppers choose to access license agreements, and that the cost of reading and comprehending the contracts are key factors).

Even when consumers do read license agreements and the like, they often find them misleading and confusing. Consumers are *more* likely to trust the

content of wordy policies written in paragraph-length format, even though they are *less* able to comprehend them as opposed to other formats. *See* Vail et al., *An Empirical Study of Consumer Perceptions and Comprehension of Web Site Privacy Policies*, 55 IEEE Transactions on Eng'g Mgmt. 442, 448-50 (2008).

Because consumers are so unlikely to actually read and understand the content of internet and mobile contracts, the requirements of reasonable notice should be *more* stringent, not less. The bare minimum often applied is not sufficient to ensure that even a minimal percentage of consumers are aware of the rights they give up. For example, the district court discussed cases finding "clickwrap agreements" more readily enforceable than "browsewrap agreements." AA474-76. But one study found that the former are only .36% more likely to be read than the latter. Marotta-Wurgler, *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's 'Principles of the Law of Software Contracts'*, 78 Univ. of Chi. L. Rev. 165, 182 (2011).

More stringent notice standards may be necessary for terms that are particularly important to consumers. In September 2009, the Federal Trade Commission issued a final consent order resolving allegations that Sears violated Section 5 of the FTC Act by installing tracking software on customers' computers. *See In re Sears Holding Mgmt. Corp.*, No. C-4263 (F.T.C. June 4, 2009), goo.gl/ESw2Mc. The FTC alleged and settled the violations even though Sears

had included a description of the tracking software in a user license agreement. Gindin, *Nobody Reads Your Privacy Policy or Online Contract? Lessons Learned and Questions Raised by the FTC's Action Against Sears*, 8 Nw. J. of Tech. & Intell. Prop. 1, 1 (2009). The Commission found this insufficient and required Sears to display the tracking software terms "[c]learly and predominately, and on a separate screen from, any" user agreement. *Sears* at 3. In other words, although "*Sears* did obtain what many would consider[] affirmative consent from consumers prior to allowing installation of the Tracking Application . . . the FTC disregarded the consent because it was not *informed* consent." Gindin, 8 Nw. J. of Tech. & Intell. Prop. at 19 n.98.

As explained in Section I above, the notice provided in this case fell well below the prevailing standards for reasonable, effective notice. That low bar asks very little of mobile businesses, yet is insufficient to provide anything resembling actual notice. Courts grant extensive deference to arbitration provisions under the guise that a 1925 statute requires it. But even expansive interpretations of the Federal Arbitration Act do not override basic principles of contract formation. Uber and its *amici* ask this Court to pile legal fiction upon legal fiction, and find effective notice where it does not exist. Protecting the "reasonably prudent" mobile customer requires better notice, not worse.

## **CONCLUSION**

The district court's decision should be affirmed.

Dated:  December 6, 2016

Respectfully submitted,
By:  /s/ Jonathan D. Selbin

Jonathan D. Selbin
Jason L. Lichtman
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
(212) 355-9500

Jahan Sagafi
Outten & Golden LLP
One Embarcadero Center, 38th Floor
San Francisco, CA 94111
(415) 638-8800

Paul W. Mollica
Outten & Golden LLP
161 Clark Street, Suite 1600
Chicago, IL 60601
(312) 809-7010

*Counsel for* Amicus Curiae *Public Justice, P.C*

# **CERTIFICATE OF COMPLIANCE**

I certify that the attached brief is proportionally spaced, has a typeface of 14 points, and contains 6,156 words.

Dated: December 6, 2016          /s/ Jason L. Lichtman
                                 Jason. L. Lichtman

## <u>CERTIFICATE OF SERVICE</u>

On December 6, 2016, I electronically filed the foregoing using the appellate

CM/ECF system, which will notify all counsel of record.

<u> /s/ Jason L. Lichtman                </u>
Jason. L. Lichtman